Howrt, Judge,
delivered the opinion of the court:
This is a claim upon two contracts for constructing locks and dams on the Great Kanawha River in West Virginia. The contracts were in the form usually made by the Government with private contractors for large river and harbor improvements, not providing a gross sum for the completion of the whole work, but a fixed sum for a given unit of each kind of work to be performed. There were numerous items, with much conflict of testimony respecting many of them. Judgment was rendered for the claimants on certain of these demands and against them on other items. The questions *561 now presented arise on a motion of tlie claimants for a new trial in connection with three of the findings.
Error of fact is alleged in the fifth finding in not finding the amount of deposits removed by the claimants 5 and error of law is said to arise in not rendering judgment for the claimants on this finding.
The provision in the specifications covering the removal of deposits in cofferdams required material washed br left in the cofferdams by freshets to be removed by the contractors, as directed, at their price for excavation. But no payment was to be made for removing material washed into the cofferdams from the coffers themselves or for any deposit made by the contractors beyond or above the work. The provision for the removal of the cofferdams themselves provided that the contractors would be required to remove these and their belongings at their own cost, the time and manner of the removal of the coffers and the place to deposit the material to be prescribed by the engineer. The court accepted the defendants’ contention that the resident engineer ordered the removal of as much of the deposits within the cofferdams as was necessary for the prosecution of the work, and that this quantity was estimated and paid for, but that the portion of the deposits banked against the face of the upper cofferdams was not in the way of construction, and its removal was consequently unnecessary, inasmuch as it was composed of such material as was easily washed away when the cofferdams were removed and the current came into contact with the deposits.
But on this point the court finds upon a careful review of the evidence that directions were given for the removal of certain of the deposits for which the claimants have not been paid. It is true that the provision for the removal of material was left discretionary with the officers in charge, or to leave this material to be washed by the current. The contractors were bound by the directions when given, regardless of whether the deposits could be washed away by the current when the cofferdams were removed. Inasmuch as we find the real fact to be that the orders were given by the government agents and the contractors have not been paid for work *562 done pursuant to these orders, we are constrained to reverse ourselves as to the consequences after reexamining the facts and finding that the orders were actually given. The engineer having decided that the deposits banked against the face of the upper cofferdams was in the way of the construction of the work, we are unable in the face of this decision of the officer to find as a fact that it was not in the way of construction, or that these deposits could have been washed out by the current in time to admit of proper progress in construction, if at all. The amended finding of the court leaves only the amount of the deposits to be calculated and the compensation to be awarded. As to the amount there is conflicting evidence. The court has gone over the testimony in detail and finds that 1,213§ cubic yards of deposits were ordered removed at government expense. The result is shown in the conclusion upon the substituted finding.
That provision for the removal of the cofferdams which provided that the coffers “ and their belongings ” should be removed at the cost of the contractors must be construed to exclude the deposits banked against the face of either cofferdam by freshets to such an extent as in the judgment of the engineer interfered with the construction of the work. These accumulations can not be said to be part of the belongings of a cofferdam within the meaning of the contract.
Error of fact and law is alleged in the sixth finding where three inspections of certain stone needed in the work were had, and in support of the motion it is alleged that the inspection referred to as the second preliminary examination was the inspection required by paragraph 111 of the contract and was final; and error of law is alleged in not rendering-judgment for the claimants for the amount of stone delivered and charged to have been accepted at higher classifications and subsequently reinspected and used at lower classifications.
It is contended that the court has adopted in this finding a different theory of inspection from that provided by the contract and has enforced upon the claimants a system of inspection by which they never agreed to be bound; that the contract provided for only one inspection and the results of that inspection are in general binding upon both parties.
*563 Paragraph 111 of the contract provided that the Government should keep inspectors on the work, who would receive instructions from the resident engineer, with power to object to any material, work, or workmanship. Any material, work, or workmanship so objected to by the inspector was to be kept out of or removed from the finished work unless in each particular case the objections of the inspector should be overruled by the local or- resident engineer. By paragraph 81 any stone chipped or spalled after being set should be rejected, or measured and paid for at a cheaper classification, as the engineer might elect. Stones having defects concealed by cement or otherwise were required to be rejected on that account alone. By paragraph 115 payments were to be made monthly when funds were available. But no payments were to be made for material until actually in place in the work and after being inspected and accepted.
From the foregoing it will be seen that there were two exceptions to the geheral rule claimed under paragraph 111. These exceptions are set forth under paragraph 115, which were for the benefit of the contractors; the other, under paragraph 81, for the benefit of the Government. But specification 109 provided that the work should be conducted under the direction of the local or resident engineer, who should have power to prescribe the order and manner of executing the same in all its parts; of inspecting and rejecting materials, work, and workmanship which in his judgment did not conform to the drawings that might be furnished from time to time or to the specifications. This was the material, work, or workmanship which when rejected was to be kept out of or removed from the finished work. The finding shows that the resident engineer ordered three inspections made of the stone previous to its being set in place in the walls, and that the first inspection was in the interest of the contractors in order that they might be saved the expense of cutting stone which might afterwards be rejected for the purposes for which it was cut. The second preliminary examination was for the purpose of ascertaining whether the stones had been properly cut and were square and whether any latent defects had been developed *564 by the cutting. The third and final inspection was made for the purpose of ascertaining the general fitness of the stone to go into the wall. The stone before final examination was to be thoroughly cleaned off and where any cracks occasioned by the blasting at the quarries were developed or slate pockets from the exposure were shown or corners knocked off, such stone was to be rejected and was either ordered to be cut for a smaller stone to fit a smaller place or reduced to a lower classification.
The contract and the specifications must be construed together. The resident engineer had the authority to reject stone entirely or to pay for it at a lower and cheaper classification, which latter alternative was obviously in the interest of the contractors if the stone as delivered was found upon final examination to be defective. We are of opinion that, inasmuch as the work was to be conducted under the direction of the resident engineer, who had power to prescribe the order and manner of executing the same in all its parts and of inspecting and rejecting material which did not conform to the drawings and specifications, and who also had power to keep imperfect stone at a lower classification, and that the engineer did prescribe the method of examining stone, there was no violation of the contract by the preliminary examinations. It is shown that the contractors assented to this course. The interpretation given the contract was beneficial to each party to the agreement and was not unreasonable. As it is shown that this interpretation was accepted without objection by the contractors and acted upon by them throughout they can not now be heard to complain.
By paragraph 112 the resident engineer was given power to overrule decisions of the inspectors and the decision of the engineer officer in charge was provided to be final and conclusive upon all matters relating to the work and upon all questions arising out of the specifications, and from his decision there was to be no appeal. The decision of the engineer officer in charge as to quality and quantity was made final. Now, this item of stone was passed upon by the resident engineer, who sustained the inspectors, and upon the *565 appeal the engineer officer in charge sustained the resident engineer. No claim of fraud or malice on the part of anyone being made, but mistaken ideas regarding the value of the stone only being alleged, and the matter having been acted upon by the resident engineer and by the engineer officer, we think there is nothing in this finding which does injustice to the contractors under the terms of the agreements.
The fact that advances were made to the claimants after certain quantities of stone had been inspected preliminary to use did not operate to prevent such inspections as the parties agreed the stone should have. These advances were general on account of the work and not for specific deliveries. There was to be no final acceptance until the general fitness of all stone to go into the walls was developed by a final inspection. Moreover, removals of unfit stone were provided for; and in providing for removals of all material found unfit after being set the contractors became bound until the work was properly done. These considerations mark the difference between this case and that of Ruffee v. United States (15 C. Cls. R., 295), where a measurement operated as an acceptance of wood agreed to be delivered and paid for. It also marks the difference between this case and Electric Fire Proofing Co. v. United States (39 C. Cls. R., 307), where lumber was inspected and accepted on the one inspection and which became final as to quality and dimensions when once inspected.
The seventh finding relates to the condemnation of a quarry. This motion rests upon the primary matter of fact which we think was properly disposed of by the weight of evidence.
The judgment heretofore rendered will be set aside and the fifth finding is directed to be amended by which the claimants are entitled to judgment. The sixth finding as originally made is amended so as to show the full facts, but the motion as to this sixth finding so as to entitle claimants to recover is overruled. The motion is overruled as to the seventh finding. On the whole case the claimants are entitled to recover $5,722.22, for which judgment will be entered.